## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

THOMAS ROEHLIG,                    :        CIVIL CASE NUMBER_____
BRIAN ROSKOVICH,                   :
MATTHEW DALGLEISH,                 :
RICK MONGE,                        :        JUDGE_____
JOHN DOE 1,                        :
JOHN DOE 2,                        :
JOHN DOE 3,                        :
JOHN DOE 4,                        :        **JURY TRIAL DEMANDED**
JOHN DOE 5,                        :
                                   :
        PLAINTIFFS,                :
                                   :
-VS-                               :
                                   :
THE OHIO STATE UNIVERSITY          :
                                   :
        DEFENDANT.                 :

---

## **COMPLAINT**

Now come the Plaintiffs, Thomas Roehlig, Brian Roskovich, Matthew Dalgleish, Rick Monge, John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5, by and through Counsel, and state and aver as follows for their complaint against the above named Defendant:

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 as the claims are matters in controversy that arise under the laws of the United States of America. Specifically, the claims are asserted under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

2.      Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) as the events giving rise to the Plaintiffs' claims occurred within this Court's district.

## PRELIMINARY STATEMENT

3.      This is a civil rights lawsuit being brought by former students of The Ohio State

University ("OSU") that are among the estimated 1,500 to 2,500 male students that were

sexually assaulted, abused, molested, and/or harassed by their OSU Physician and Athletic Team

Doctor, Dr. Richard Strauss, M.D.

4.      At OSU, Dr. Strauss was an employee, tenured faculty member, and the Associate

Director of OSU's sports medicine program.  He served as a physician in both the athletic

department and the OSU student health center.

5.      Dr. Strauss' OSU career spanned over nineteen (19) years from approximately 1979

through 1998.  Throughout his approximate nineteen (19) years at OSU as both a physician in

the athletic department and in the student health center, Dr. Strauss used his position of trust and

confidence as a physician to sexually molest, sexually assault, sexually abuse, and/or sexually

harass countless OSU male student-athletes and students.

6.      The Plaintiffs consented to receiving medical treatment from Dr. Strauss while student-

athletes and students at OSU.  However, these student-athletes and students never consented to

Dr. Strauss' sexual molestation, sexual assault, sexual abuse, and/or sexual harassment as Dr.

Strauss frequently went beyond the stated medical purpose of their examinations, and their

examinations often were not consistent with the standard of care for medical examinations.

7.      Dr. Strauss was designated the team physician for many sports at OSU, including the

sports teams that used Larkins Hall.  In particular, Dr. Strauss was the team physician for men's

wrestling.  As such, OSU student-athletes as well as OSU wrestlers were susceptible to medical

examinations by Dr. Strauss, if they wanted to receive medical treatment.

2

8.      Larkins Hall was home to the OSU Varsity Wrestling Team as their practice facility.  The wrestling locker room was located on the main floor, inside the general men's locker room.  The wrestling locker room had a separate locked area with lockers located around the perimeter of the room.  Also, the wrestlers shared a shower area, toilet area, and sauna area with the general OSU population that included students, employees, faculty members, and staff of OSU.  Further, the wrestlers would walk across a hallway to access their training room, which was located on the main floor of Larkins Hall.  This training area had approximately six (6) training tables, approximately two whirlpools, and a private office area where the athletes would meet with Dr. Strauss.  Further, most wrestlers accessed the wrestling room by walking up a private spiral staircase located at the end of the hallway that separated the locker room and training room.  This spiral staircase ascended to the third floor wrestling room.

9.      After wrestling practice, the wrestlers would shower in the first floor general shower area.  Here, wrestlers were often harassed not only by Dr. Strauss, but also by numerous students, employees, faculty members, and/or staff.  These individuals harassed the wrestlers by leering and/or voyeuristically staring at the wrestlers while they showered.  These individuals sometimes would shower with the wrestlers, stare at the wrestlers, and excessively lather their genital area.  Moreover, some individuals became erect in the shower area and even masturbated while in the shower area.  Also, some individuals voyeuristically stared at the wrestlers from inside a bathroom stall by looking through a crack in the door or by voyeuristically looking over the bathroom stall door, in turn, some of these individuals masturbated while voyeuristically watching the wrestlers.

3

10. The wrestlers would frequently use the sauna facilities at Larkins Hall, which was part of the general men's locker room. While using the sauna facilities, Dr. Strauss and other students, employees, faculty members, and/or staff would voyeuristically watch the wrestlers.

11. In the locker room, shower area, toilet area, and/or sauna facilities, wrestlers were solicited for dates and/or sexual encounters.

12. Members of the wrestling team and coaching staff consistently discovered male on male sexual encounters in the locker room, bathroom, sauna facilities, spiral staircase, and wrestling room.

13. Further, each OSU athlete had to participate in a pre-season physical before the athlete was cleared to participate in their sport. Many times, these pre-season physicals were held in the training room at the Woody Hayes Athletic Center. During the pre-season physicals, the athlete would participate in a number of stations that included a station for blood pressure, a station to check your reflexes, a station to make a mouthpiece, etc. The final station would be a hernia examination with Dr. Strauss.

14. As students progressed through the stations, the hernia station always took the longest. Here, Dr. Strauss would excessively fondle and inspect the genitals and anuses of male athletes. These exams lasted approximately five (5) to fifteen (15) minutes.

15. Dr. Strauss would give explanations for the prolonged need for his medical exams. Frequently, Dr. Strauss would tell athletes that he was just being thorough, needed to check their lymph nodes, needed to check for STDs, and/or that he was checking for testicular cancer.

16. Typically for a pre-season physical, Dr. Strauss would ask the athlete to enter the room. Dr. Strauss would shut the door and ask the athlete to undress. Dr. Strauss would examine the athlete from his shoulders to his groin area. Dr. Strauss would closely look at the athlete's skin,

4

lifting the athlete's arms and running his hands down the athlete's chest. Then, Dr. Strauss would grab a stool on wheels and roll up to the athlete's groin area so the athlete's penis was at the height of Dr. Strauss' facial area. Sometimes, Dr. Strauss would turn off the lights and would use a purplish light headlamp to examine the athlete. Either way, Dr. Strauss' face was close enough that the athlete could feel Dr. Strauss' breath on his penis and testicles. Typically, Dr. Strauss would hold the athlete's testicles in his left hand and he gently massaged the athlete's testicles. With his right hand, Dr. Strauss would hold the athlete's penis and move the athlete's penis in different directions as to appear to be examining the shaft of the athlete's penis. Dr. Strauss would continue this examination with the athlete for approximately five (5) to fifteen (15) minutes. Once completed, occasionally, Dr. Strauss would ask the athlete to turn around. Dr. Strauss would instruct the athlete to put his hands on his buttocks and spread the athlete's buttocks. Then, Dr. Strauss would instruct the athlete to cough. During this anus examination, Dr. Strauss would still be on his stool with the athlete's buttocks approximately one (1) foot from Dr. Strauss' face. Dr. Strauss failed to use examination gloves during the pre-season physicals.

17.     In April 2018, OSU authorized an independent investigation into the allegations of sexual abuse levied against Dr. Strauss. The law firm of Perkins Coie, LLP conducted approximately a yearlong independent investigation that interviewed over five hundred (500) individuals with a cost to OSU of over six (6) million dollars. On May 15, 2019, Perkins Coie, LLP issued findings from its independent investigation that found Dr. Strauss sexually abused at least 177 male student-patients that he was charged with treating as a University Physician. Also, Perkins Coie, LLP found that University personnel had knowledge of Strauss' sexually abusive treatment of male student-patients as early as 1979, but that complaints and reports about Strauss' conduct were not elevated beyond the Athletics Department or Student Health until 1996.

18.     On May 17, 2019, OSU President Dr. Michael Drake and OSU Board of Trustees Chair Michael Gasser issued a letter to The Ohio State University Community that stated the findings of the independent investigation were shocking and painful to comprehend. Also, the two OSU leaders offered their profound regret and sincere apologies to each person that endured Strauss' abuse, and for OSU's fundamental failure at the time to prevent the abuse.

19.     Plaintiffs believe that at least six (6) other lawsuits are pending before this Honorable Court. See, e.g., *John Doe 1 et. al. v. The Ohio State University*, Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Brian Garrett et. al. v. The Ohio State University*, Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Steve Synder-Hill et. al. v. The Ohio State University*, Case No. 2:18-cv-00736-MHW-EPD (S.D. Ohio); *John Doe M.B. et. al. v. The Ohio State University*, Case No. 2:19-cv-01911-GCS-CMV (S.D. Ohio); and *Michael Disabato, et. al. v. The Ohio State University*, 2:19-cv-02237-MHW-EPD; *Nicholas Nutter, et. al. v. The Ohio State University*, 2:19-cv-02462.

20.     Plaintiffs John Does 1-5 have filed anonymously in this action due to the highly personal nature of the circumstances giving rise to their claims.

21.     Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of higher learning and a large majority of the Plaintiffs continue to love OSU dearly and remain devoted members of The Buckeye Nation. As such, Plaintiffs have an extremely difficult time understanding how "the state up north" can fully acknowledge and compensate the victims/survivors of sexual abuse, whereas a leading Big 10 institution such as OSU has struggled to do so.

22.     Plaintiffs were honored to represent OSU in competitive NCAA Division I athletics and did their best to continue the University's tradition of excellence.

6

23.     Plaintiffs honorably attended OSU expecting the University would provide them with a safe and supportive environment that would help them perform both academically and athletically.

24.     Plaintiffs believed that OSU Team Physicians like Dr. Strauss hold a special relationship of trust and confidence with their student-patients. These physicians become even more important to a NCAA Division I athlete as the student-athlete requires immediate treatment in order to compete in the rigors of their respective sport.

25.     Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty, which included the need to regularly and competently evaluate the quality of care and the integrity of the medical services that Dr. Strauss provided to OSU's students and student-athletes.

26.     Plaintiffs trusted that OSU personnel would not conceal, disguise, cover up, and/or disregard known circumstances that raised a substantial likelihood that Plaintiffs would be sexually molested, sexually assaulted, sexually abused, and/or sexually harassed by Dr. Strauss. Likewise, the Plaintiffs trusted that OSU personnel would not conceal, disguise, cover up, and/or disregard known circumstances that raised a substantial likelihood that Plaintiffs would be sexually harassed and/or sexually abused at an OSU athletic facility, namely Larkins Hall.

27.     At all times relevant to this complaint, OSU officials with the authority to institute corrective measures actively concealed, failed to disclose, covered up, and/or showed deliberate indifference towards circumstances that indicated Dr. Strauss was sexually abusing male student-athletes and students.

28.     At all times relevant to this complaint, OSU personnel failed to implement corrective measures despite having actual knowledge Dr. Strauss was sexually abusing and/or sexually

7

harassing students and student-athletes and Larkins Hall presented a sexually hostile environment to male student-athletes.

29.     OSU officials knowingly, intentionally, and/or recklessly aided, abetted, and/or concealed Dr. Strauss' sexual predation on its student-athletes and students. OSU ignored complaints and disregarded commonly known information and improper and/or inappropriate practices used by Dr. Strauss over his nineteen (19) year career.

## PARTIES

30.     The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through twenty-nine (29) as if fully written herein.

31.     Defendant The Ohio State University was at all relevant times contained herein and presently continues to be a public university organized and existing under the laws of the State of Ohio.

32.     Defendant OSU received at all relevant times contained herein and presently continues to receive federal financial assistance, which subjects OSU to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

33.     At all relevant times herein, Plaintiffs were enrolled at OSU as students during Dr. Strauss' employment with OSU.

34.     Plaintiff athletes participated in NCAA Division I intercollegiate athletics, while enrolled at OSU as members of OSU's Varsity Wrestling, Football, and Soccer Teams.

35.     Plaintiff Thomas Roehlig is a resident of Massillon, Ohio. He is a 1989 graduate of Massillon Washington High School, where he was an OHSAA Wrestling State Placer.

36.     Plaintiff Roehlig attended OSU from the years of 1989-1993. While at OSU, Mr. Roehlig was a three (3) year member of the varsity wrestling team.

37.     Plaintiff Roehlig believes that he was examined approximately twelve (12) times by Dr. Strauss for a physical injury and/or sickness and Dr. Strauss sexually assaulted Mr. Roehlig approximately ten (10) times.

38.     Plaintiff Roehlig was inappropriately groped in his genital area by Dr. Strauss when he was examined for impetigo on his face as well as neck and back soreness.

39.     Mr. Roehlig recalls that Dr. Strauss sexually assaulted Mr. Roehlig to the point where Mr. Roehlig was near erection several times.

40.     Plaintiff Brian Roskovich is resident from Miamisburg, Ohio.  He graduated from Bridgeport High School in 1995 as the Class Valedictorian.  Also, Mr. Roskovich was a four time OHSAA State Placer, a 1995 OHSAA Division III State Champion, and 1995 Outstanding Wrestler Award Recipient.

41.     Plaintiff Roskovich attended OSU for seven (7) years starting in 1995, graduating with a Bachelor of Arts degree in History and a Masters of Education.  Also, Mr. Roskovich was a Big Ten Conference Medal of Honor Finalist, five (5) time Academic All-Big Ten, four (4) time Varsity Letter Winner, and National Tournament Qualifier.

42.     Plaintiff Roskovich was examined by Dr. Strauss on approximately (3) occasions and sexually assaulted on at least one (1) occasion.  Mr. Roskovich received a prolonged genital exam conducted by Dr. Strauss that centered on his genital area.

43.     Plaintiff Roskovich recalls downplaying his injuries and/or not telling the training staff about his injuries in order to avoid being seen by Dr. Strauss.

44.     Plaintiff Matthew Dalgleish is a resident of Medina, Ohio.  He graduated from Medina Buckeye High School in 1993.  While in high school, Mr. Dalgleish was an All-American.

45.      Plaintiff Dalgleish attended OSU from the years 1995-1998, graduating with a degree in Psychology in 1997 and a Masters in Elementary Education in 1998. Mr. Dalgleish was a member of the Varsity Wrestling team for two (2) years.

46.      Plaintiff Dalgleish states that he was examined by Dr. Strauss for a physical and/or injury/illness approximately two (2) times. During both examinations, Dr. Strauss sexually assaulted and/or groped Plaintiff Dalgleish.

47.      Plaintiff Rick Monge is resident of Irvine, California. He graduated from Mater Dei High School in 1990. While in high school, Mr. Monge was a 1990 California State High School Wrestling Champion.

48.      Plaintiff Monge attended OSU from the years 1992-1995 and graduated with a Bachelor of Science in Electrical Engineering in 1995. While at OSU, Mr. Monge was a three (3) year member of the Varsity Wrestling Team.

49.      Plaintiff Monge was examined by Dr. Strauss approximately ten (10) times. Moreover, he was sexually assaulted by Dr. Strauss approximately four (4) times.

50.      Plaintiff John Doe 1 is a resident of Bay Village, Ohio. He graduated from high school in 1986.

51.      Plaintiff John Doe 1 attended OSU from 1986-1991, graduating with a Bachelor of Arts Degree in Economics. While at OSU, Plaintiff John Doe 1 was a member of the OSU Varsity Wrestling Team for one (1) year and Dr. Strauss was the leading cause to Plaintiff John Doe 1 leaving the team.

52.      Plaintiff John Doe 1 was examined by Dr. Strauss approximately five (5) times and was sexually assaulted by Dr. Strauss on approximately three (3) occasions. Dr. Strauss would

unnecessarily examine John Doe 1's penis. Moreover, John Doe was sexually abused to the point of erection on at least one occasion and near erection on another.

53.     Plaintiff John Doe 2 is a resident of Hilliard, Ohio. He graduated from high school in 1979 and was a two (2) time OHSAA State Champion.

54.     Plaintiff John Doe 2 attended OSU from 1979-1984 and was a four (4) year Varsity wrestler.

55.     Plaintiff John Doe 2 was examined by Dr. Strauss over twenty (20) times and believes that he was sexually assaulted by Dr. Strauss on a few occasions.

56.     Plaintiff John Doe 3 is a resident of Painesville, Ohio. He graduated from High School in 1988. While in high school, John Doe 3 was an OHSAA State Wrestling Champion as well as an All-Ohio Football Player.

57.     Plaintiff John Doe 3 attended OSU from the years of 1988-1994, graduating with a Bachelor's Degree in 1993 and a Masters Degree in 1994. John Doe 3 competed at OSU in Varsity Wrestling for one (1) year and Varsity Football for four (4) years. John Doe 3 earned Academic All-Big Ten honors as well as Defensive Lineman of the Year.

58.     Over his career, John Doe 3 was examined by Dr. Strauss in excess of twenty (20) times. In all examinations, John Doe believes Dr. Strauss was inappropriate and/or sexually assaulted him approximately twelve (12) times.

59.     John Doe 3 was given unnecessary physicals that involved the fondling/groping of his genital area for ailments such as: sore throat, ear ache, stingers, turf toe, and a skin disease on his right wrist.

60.     Plaintiff John Doe 4 is a resident of Loveland, Ohio. He is a 1977 high school graduate. While in high school, John Doe 4 participated in soccer, ice hockey, and was an Eagle Scout.

61.     Plaintiff John Doe 4 attended OSU from 1977-1982 and graduated with a Bachelors of Arts in Political Science in 1982.  In 1986, John Doe 4 received his Juris Doctorate.  While at OSU, John Doe 4 participated on the Varsity Soccer Team for four (4) years.

62.     Plaintiff John Doe 4 was examined by Dr. Strauss approximately five (5) times and was sexually assaulted by Dr. Strauss on approximately three (3) different occasions.  John Doe 4 was being groped/fondled by Dr. Strauss as John Doe 4 was being treated for a bone bruise to the top of his left foot.

63.     Plaintiff John Doe 5 is a resident of Florida.  John Doe 5 graduated from high school in 1983 and was a member of the High School Honor Society.

64.     Plaintiff John Doe 5 attended OSU in the years 1983-1988, graduating with a Bachelor of Science Degree in Education in 1988.  John Doe 5 was a student athletic trainer at Ohio State from 1983-1988.  He was assigned the following sports as a student trainer:  Football-four (4) years, Men's Swimming, Men's Diving, Men's Baseball, Men's Cross Country, Men's Track and Field- both indoor and outdoor for two (2) years.  Also, John Doe 5 worked the summer camp for the New York Jets Pro Football Team at Hofstra University in Hempstead, New York.

65.     Plaintiff John Doe 5 was examined by Dr. Strauss on approximately three (3) different occasions and was sexually assaulted by Dr. Strauss during these physical examinations.

## **FACTS**

66.     The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through sixty-five (65) as if fully written herein.

67.     Defendant OSU employed Dr. Richard Strauss, M.D., as a faculty member from approximately September 1978 until approximately March 1, 1998.

12

68.     In approximately September 1978, Dr. Strauss started with OSU as an Assistant Professor in the College of Medicine. Months later, Dr. Strauss was volunteering with the University Athletics Department as a team physician for several teams located in Larkins Hall.

69.     By approximately 1980, Dr. Strauss was serving as an Associate Director of the Sports Medicine program.

70.     By approximately 1981, Dr. Strauss began an appointment in the Athletics Department, including medical responsibilities at the Sports Medicine Clinic located in the University's Student Health Services.

71.     Over the years, Dr. Strauss' responsibilities as a team physician expanded beyond Larkins Hall to other athletic facilities, which included: the Woody Hayes Athletic Center, Ernie Biggs Athletic Training Facility, and St. John Arena. Moreover, Dr. Strauss treated patients at Student Health Services.

72.     Dr. Strauss was granted tenure by OSU as an associate professor in approximately 1983.

73.     Dr. Strauss was granted a full professorship with tenure by OSU in approximately 1992.

74.     In addition to his above duties, in approximately 1994, Dr. Strauss also began a part-time appointment treating students on the third floor of Wilce Student Health Center.

75.     In approximately March 1998, Dr. Strauss voluntarily retired and was granted Emeritus Status by the OSU Board of Trustees in the School of Public Health. Dr. Strauss' Emeritus Status was bestowed upon him despite the lack of review or approval from the Dean of the College of Medicine and Public Health.

76.     Over his career, Dr. Strauss treated male student-athletes in the following sports: swimming, diving, wrestling, gymnastics, fencing, lacrosse, hockey, cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football

77.     During the above stated times and/or years and while working for Defendant OSU, Dr. Strauss sexually abused the Plaintiffs and other OSU Students under the guise of medical treatment during their medical examination in one or more of the following ways:

        a.      Dr. Strauss extremely manipulated or stimulated his student-patient's genitals, which included unwanted oral sex and fondling that caused ejaculation or near ejaculation.

        b.      Dr. Strauss fondled the student-patient to the point of erection or near erection.

        c.      Dr. Strauss performed prolonged and/or medically unnecessary genital and rectal exams.

        d.      Dr. Strauss committed other inappropriate and abusive practices toward his student-patients such as unnecessary nudity of the student-patient, excessive touching and/or groping of the student-patient, verbal commentary and inappropriate questions, lack of examination gloves, inappropriate physical position and/or invasion of space of the student-patient, performing treatments outside of a clinical setting, and "quid pro quo" arrangements with the student-patient.

        e.      Dr. Strauss inappropriately showered alongside student-patients, loitered in student-athletes locker rooms, engaged in voyeuristic behavior, and initiated fraternization with student-patients by calling their residences, inviting and paying for their meals, and asking to take pictures for the student-patients to help them start a modeling career.

78.     Strauss committed the above-mentioned acts of sexual abuse and/or sexual harassment consistently on an almost daily basis as an OSU faculty member and OSU athletic team physician.

79.     As set forth below, Plaintiffs as student-patients were vulnerable to Strauss' sexual abuse and many student-patients were not able to identify Strauss' conduct as sexual abuse when it occurred.

80.     Plaintiffs were treated by Dr. Strauss in his official capacity as their OSU Team Physician and/or medical doctor working for OSU.

81.     Plaintiffs had little and/or no experience with medical doctors and/or examinations without their parents being present. Plaintiffs were taught to respect their elders and were under the belief that their OSU Team Physician had their best health interests in mind during their examination.

82.     The Plaintiff athletes attributed and/or rationalized Dr. Strauss' inappropriate behavior as being the thoroughness needed for participation in NCAA Division I Athletics, for which Plaintiffs knew they had to undergo a pre-season physical in order to participate.

83.     Plaintiffs were sexually assaulted and/or abused by Dr. Strauss under the guise of legitimate medical examinations.

84.     Plaintiff athletes were compliant with the Dr. Strauss as their OSU Team Physician in order to regain their good health to compete and/or represent OSU to the best of their ability.

85.     Plaintiffs were not educated nor taught that male sexual abuse could exist within the confines of the OSU Athletic Department. Further, male sexual abuse was not a commonly acknowledged problem or commonly discussed among non-educators or people outside the medical field.

86.     Dr. Strauss preyed upon Plaintiffs with his superior medical knowledge and was able to dispel any of the Plaintiffs' objections with this knowledge. Plaintiffs did not have the

15

education, knowledge, and/or experience in the medical field to limit Dr. Strauss' physical contact during their examinations.

87.     Plaintiffs believed and trusted OSU.  Plaintiffs believed OSU would protect, inform, and/or remove them from harmful situations, even if it involved their Team Physician and/or an OSU medical doctor.

88.     Plaintiff athletes believed that accusing an OSU Professor and/or Team Physician of committing sexual assault would risk their status on the team and/or their athletic scholarship as well as their status as a student at OSU.  Plaintiff, John Doe 5 believed that accusing an OSU Professor and/or Team Physician of committing sexual assault would risk his status as a student trainer and student at OSU.

89.     Plaintiffs athletes feared being ridiculed and/or ostracized if they complained to their teammates and the teammates failed to report similar experiences.  Plaintiff John Doe 5 feared being ridiculed and/or ostracized if they complained to other student trainers and/or students, who did not have similar experiences.

90.     Plaintiffs had no options in their treatment.  OSU provided their medical staff and facilities to the Plaintiff athletes.  Plaintiffs needed to see Dr. Strauss not only to heal quickly, but also, to save time, and/or money.

91.     OSU led Plaintiffs to believe that Strauss' sexually abusive examinations, methods, and statements were medically acceptable behavior and/or practices.

92.     Not until and/or within the past two years have Plaintiffs had a reasonable basis for believing that OSU had actual knowledge Dr. Strauss was sexually abusing male students in a clinical setting.

93.     Not until and/or within the past two years have Plaintiffs had a reasonable basis for
believing that OSU concealed or remained deliberately indifferent to the substantial risk that Dr.
Strauss was sexually abusing them and other OSU male students.

94.     Plaintiffs had no reasonable way of knowing that OSU had actual knowledge that Dr.
Strauss was sexually abusing male student-athletes and students in a clinical setting.  Plaintiffs
had no way of learning what and when OSU knew about Dr. Strauss and/or how OSU chose to
permit continued sexual abuse by Dr. Strauss.  Plaintiffs could not have exercised reasonable due
diligence that would have revealed how OSU's acts and omissions caused Plaintiffs to suffer
independent injuries from the injuries caused by Dr. Strauss.

95.     OSU had a deliberate indifference toward Dr. Strauss' conduct as student-athletes,
students, and OSU staff reported and referred complaints about Dr. Strauss to various OSU
employees throughout Dr. Strauss' career.

96.     At all relevant times in regard to this Complaint, and on information and belief, OSU
staff and/or employees with authority to stop Dr. Strauss' access to patients, prevent Dr. Strauss
from sexually abusing patients in a clinical setting, and/or implement other corrective measures
as OSU had actual knowledge that there was a substantial likelihood that Strauss was sexually
assaulting and abusing male student-athletes and male students.  Moreover, OSU had actual
knowledge that Dr. Strauss posed a substantial risk of sexual abuse as early as 1979.

97.     OSU employees in the Sports medicine program and the Athletics Department had actual
knowledge that Dr. Strauss was conducting prolonged genital exams and that Dr. Strauss refused
to allow athletic training staff to be present during such exams.

98.     OSU, through its own administrators, faculty, and staff, had actual notice of Dr. Strauss'
sexual abuse of male student-athletes and students.  Yet, OSU denied, dismissed, disregarded,

17

minimized, refuted, silenced, and even concealed complaints about Dr. Strauss' sexual misconduct. Even though OSU had evidence that Dr. Strauss was a substantial risk to their male student-athletes and male students, OSU failed to act. On Plaintiffs information and belief, OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male students, even though many high ranking officials such as Athletic Directors, Assistant Athletic Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and/or Athletic Trainers could have taken action to prevent this systemic sexual abuse.

99.     Further, the nurses at Student Health Services made various complaints regarding Dr. Strauss. These complaints were that Dr. Strauss showed up unannounced to treat patients, performed prolonged examinations behind closed doors, and failed to chart and/or fill out medical records, which was and continues to be a standard medical practice in order to document a patients' medical history and provide follow-up care.

100.    Plaintiffs believe this lack of medical documentation is troubling and OSU allowed Dr. Strauss to continue to disregard charting and/or filling out of important medical documentation. This lack of documentation allowed Dr. Strauss to misrepresent the nature of a patient's visit and/or allowed Dr. Strauss to deny whether he even examined the said patient.

101.    OSU failed to direct Strauss to stop showering and/or sharing a locker room with their male student-athletes, failed to direct a third person from the training staff to be present when treating their male student-athletes, failed to properly investigate any of the reports and/or rumors, concerning Dr. Strauss and failed to have a meaningful sexual abuse policy for its students.

102.    Simply put, OSU failed its male student-athletes and male students from the years 1979-

1998 as OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was a

sexual predator and were deliberately indifferent to these facts.

103.    Additionally, OSU failed to address the sexual harassment in its athletic facility at

Larkins Hall.

104.    Larkins Hall was home to many sports such as swimming, diving, gymnastics, fencing

and wrestling.

105.    In Larkins Hall, the OSU Varsity Wrestlers were victims of a harassing environment that

allowed OSU's faculty, staff, and students to voyeuristically leer and/or stare at these wrestlers

as they showered or used the sauna facilities.

106.    Further, male on male sexual interactions were frequent in areas of Larkins Hall that were

frequented by the OSU wrestling team.  There were instances of male on male sexual encounters

in the bathroom, the sauna, the private winding stairwell entrance to the wrestling room, the

wrestling room, and the bathroom in the hallway outside of the wrestling room.

107.    The OSU Wrestling Coaches repeatedly tried to secure a separate shower facility for their

wrestlers and/or move their wrestlers into a separate facility.  Further, in approximately 1995,

two varsity wrestlers approached the Athletic Director with schematic drawings to separate the

wrestlers into their own space.  The OSU Athletic Director reported to the wrestlers that these

plans would be too expensive.  As a concession, the OSU Athletic Department cleaned the

wrestling locker room carpets that week.

108.    The wrestling coaches consistently asked for better accommodations as the Larkins Hall

sexual harassment environment seriously impacted the psyche and morale of the OSU Wrestling

Team.  The coaches would even address the team as to this issue and continually informed the

wrestlers that the coaching staff was doing everything the staff could do to remove the team from the sexual harassment.

109.    Dr. Strauss was a part of the sexual harassment environment of Larkins Hall. Dr. Strauss took long showers with the wrestling team. During these showers, Dr. Strauss would voyeuristically stare at the wrestlers. After his shower, Dr. Strauss would enter the wrestling locker room and position himself to leer at the wrestlers as he patted himself dry. Additionally, he would use the sauna facilities with the wrestlers and voyeuristically watch them. Dr. Strauss' showering obsession was to the point that he would sometimes reduce his examination times to allow him to shower. Moreover, many wrestlers saw Dr. Strauss take more than one shower in a short amount of time, which allowed Dr. Strauss to voyeuristically gaze at his "favorite wrestlers."

110.    OSU had actual knowledge that their Varsity Wrestling Team was being sexually harassed in Larkins Hall and OSU was deliberately indifferent to these facts. Even though OSU knew of Larkins Hall's sexually hostile environment, OSU took zero steps to protect their student-athletes.

111.    OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was showering and using the wrestling locker room as well as other male sports' locker rooms in Larkins Hall and OSU was deliberately indifferent to these facts.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION – VIOLATIONS OF TITLE IX 20 U.S.C. §1681(a), *et seq.*

## Heightened Risk Claim

112.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through one hundred and eleven (111) as if fully written herein.

113. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1631(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...."

114. Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment, including sexual assault, by school employees, students, and third parties.

115. Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when either:

a. the conduct is made as a term or condition of an individual's employment, education, living environment or participation in a University community.

b. the acceptance or refusal of such conduct is used as the basis or a factor in decisions affecting an individual's employment, education, living environment, or participation in a University community.

c. the conduct unreasonably impacts an individual's employment or academic performance or creates an intimidating, hostile or offensive environment for that individual's employment, education, living environment, or participation in a University community.

116. At all relevant times contained herein, while OSU was acting under Title IX, OSU subjected Plaintiffs to a deprivation of their rights, privileges, and immunities secured by the Constitutions and laws of the United States and the State of Ohio.

117. At all relevant times contained herein, OSU received federal financial assistance. As a result, OSU is subject to Title IX. Pursuant to Title IX 20 U.S.C. §1681(a), *et seq.*, the OSU owed Plaintiffs duties to act prudently and with reasonable care, and otherwise to promptly

investigate all allegations of sexual harassment, sexual assault, and sexual abuse regarding Dr. Strauss as he was an OSU employee, faculty member, and Team Physician.

118. OSU subjected the Plaintiffs to Dr. Strauss, who sexually molested, assaulted, abused, and harassed the Plaintiffs. This included, but is not limited to, the following: fondling of the their testicles, fondling of their penises, digitally penetrating their anuses, rubbing his genitals on their bodies during an examination, voyeuristically staring at them while they showered, making sexual comments toward them, calling them at their residences, inviting them to dinner, and asking the Plaintiffs to allow him to take semi-nude photographs were all acts of sexual discrimination under Title IX.

119. OSU had actual knowledge of the consistent sexual molestation, assault, abuse, and harassment.

120. From approximately 1979-1998, male student-athletes, male students, and coaches conveyed complaints and concerns regarding Dr. Strauss' inappropriate sexual conduct to OSU administrators.

121. OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male students, even though many high-ranking officials such as Athletic Directors, Assistant Athletic Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and Athletic Trainers could have acted to prevent this systemic sexual abuse.

122. OSU failed to respond promptly and adequately to address the sexual misconduct of Dr. Strauss and to protect its male student-athletes and male students, which is a blatant violation of Title IX.

123. OSU, through its acts and omissions, acted with deliberate indifference to the sexual molestation, assault, abuse, and harassment that the Plaintiffs as well as other male OSU students

endured. OSU failed to respond to the sexual misconduct of Dr. Strauss and their inaction was clearly unreasonable in light of the known circumstances.

124. OSU's failure to promptly respond, investigate, and act on complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, caused the Plaintiffs to experience further sexual molestation, assault, abuse, and harassment and/or made the Plaintiffs more vulnerable to it into the future.

125. OSU's failure to promptly respond, investigate, and act to complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, created a sexually hostile environment that effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care. OSU's deliberate indifference was so severe, pervasive, and objectively offensive that it deprived the Plaintiffs of access to the educational opportunities or benefits provided by OSU.

126. As a direct and proximate cause of OSU's blatant violation of Title IX as well as the rights bestowed to Plaintiff's under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life, which will continue into the future. Also, Plaintiffs were prevented from and continue to be prevented from obtaining the full enjoyment of life. Plaintiffs have sustained and continue to sustain loss of earnings and earning capacity. Finally, Plaintiffs have incurred various personal expenses.

**SECOND CAUSE OF ACTION – VIOLATIONS OF TITLE IX 20 U.S.C. §1681(a), *et seq*.**

**Hostile Environment Claim**

127.   The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through one hundred and twenty-seven (127) as if fully written herein.

128.   At all times previously mentioned herein, Plaintiff wrestlers, trained mainly for their respective sport in Larkins Hall.  As such, the Plaintiffs were entitled to use the athletic facilities at Larkins Hall free from sexual molestation, assault, abuse, and harassment.

129.   OSU owed the Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

130.   OSU had actual knowledge of the hostile sexual environment at Larkins Hall.  The Athletic Director, Assistant Athletic Directors, Associate Athletic Directors, and/or Building Supervisor had actual knowledge of the hostile environment and these individuals had the authority to take corrective action as individuals using the facility were required to be students, faculty, staff, and/or employees of OSU.  Yet, these individuals failed any opportunity to rectify the hostile environment at Larkins Hall.

131.   Also, OSU was deliberately indifferent to this hostile environment even though OSU exercised substantial control.  In fact, this environment was so severe, pervasive, and objectively offensive that it deprived the Plaintiffs of access to the educational opportunities and/or benefits provided by OSU.

132.   The hostile environment at Larkins Hall effectively barred the Plaintiffs from access to numerous educational opportunities and benefits, which include, but is not limited to, full use and enjoyment of the wrestling practice facilities, shower room, locker room, sauna, and all other Larkins Hall equipment and facilities.

133.   OSU violated Title IX by failing to remedy the sexually hostile and abusive environment in Larkins Hall.

134.   As a direct and proximate cause of OSU's violation of the Plaintiffs rights under Title IX, the Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life.

135.   As a direct and proximate cause of OSU's violation of Plaintiffs' rights under Title IX, the Plaintiffs were prevented and continue to be prevented from obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, and incurred various personal expenses.

## THIRD CAUSE OF ACTION – VIOLATIONS OF TITLE IX 20 U.S.C. §1681(a), *et seq.*

### Unlawful Retaliation Claim

136.   The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through one hundred and thirty-five (135) as if fully written herein.

137.   Retaliatory conduct is within the broad prohibition of discrimination made unlawful by Title IX.

138.   Plaintiffs stated that they engaged in the protective activity of reporting and disclosing the rampant sexual molestation, assault, abuse, and harassment that occurred from the years 1979-1998 at OSU by OSU employee, faculty member, and Team Physician, Dr. Strauss. Also, the Plaintiffs exposed the sexually hostile environment that existed at Larkins Hall.

139.   OSU had knowledge of the Plaintiffs reports and disclosures of the rampant sexual molestation, assault, abuse, and harassment to the extent that OSU hired an independent law firm, Perkins Coie L.L.P., to investigate the Plaintiffs' allegations.

140.    OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU recklessly, willfully, intentionally, and/or deliberately tried to disparage the Plaintiffs and/or silence their voices so the Plaintiffs' reports and disclosures of the rampant sexual molestation, assault, abuse, and harassment regarding OSU would not come to light.

141.    In July 2018, one current OSU employee gave a public interview on Columbus radio station QFM 96.3. During his interview, the OSU employee tried to paint a derogatory picture of the Plaintiffs and similarly situated Plaintiffs as he stated that the reports concerning Dr. Strauss and OSU were basically a money grab. Also, the OSU employee pointed out that OSU would not simply lay down the way Michigan State had done.

142.    In the summer of 2018, OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU emailed, texted, and/or called the Plaintiffs and similarly situated Plaintiffs in order to get the Plaintiffs and similarly situated Plaintiffs to not reveal their individual stories and/or silence them.

143.    Further, OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU emailed, texted, and/or called the Plaintiffs and similarly situated Plaintiffs in order to assess the extent of the damage that Defendant OSU could face in a possible lawsuit.

144.    On information and belief, OSU has not taken disciplinary action against these OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU that emailed, texted, and/or called the Plaintiffs and similarly situated Plaintiffs. As such, OSU has ratified these individuals' actions and independently violated Title IX.

145.    As a direct and proximate result of OSU's retaliation, the Plaintiffs have suffered and continued to suffer emotional distress, physical manifestations of emotional distress, mental

anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life.

146.    As a direct and proximate cause of OSU's violation of Plaintiffs' rights under Title IX, the Plaintiffs were prevented and continue to be prevented from obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, and incurred various personal expenses.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court:

a.      Enter judgment in favor of Plaintiffs on their first, second, and third causes of action under Title IX 20 U.S.C. §1681(a), *et seq.* against Defendant The Ohio State University;

b.      Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

c.      Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present, and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

d.      Award Plaintiffs pre-judgment and post-judgment interest;

e.      Award Plaintiffs their court costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988 (b); and

f.      Grant such other relief as this Court deems just and proper.

27

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues in the above mentioned Complaint.


Respectfully Submitted,


_/s/Rocky Ratliff_
J.C. Ratliff (#0027898)
Rocky Ratliff (#0089791)
Edwin M. Bibler (#0097668)
Attorney for Plaintiffs
200 West Center Street
Marion, Ohio 43302
Telephone:  740/383-6023
Fax:  740/383-2066
Email:  attorney.ratliff@gmail.com